**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2658-18

J.M.F.,

    Petitioner-Appellant,

v.

DEPARTMENT OF TREASURY,
DIVISION OF PENSIONS AND
BENEFITS,

    Respondent-Respondent.

_____

Submitted September 15, 2021 – Decided September 28, 2021

Before Judges Geiger and Susswein.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.

J.M.F., appellant pro se.

Andrew J. Buck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Connor V. Martin, Deputy Attorney General, on the brief).

PER CURIAM

Appellant J.M.F.,[1] a former teacher, appeals from an October 17, 2018 final decision of respondent Board of Trustees (the Board) of the Teachers' Pension and Annuity Fund (TPAF), within the Department of the Treasury, Division of Pensions and Benefits, denying her application for accidental disability retirement benefits pursuant to N.J.S.A. 18A:66-39(c). She also appeals from a January 24, 2019 TPAF final decision denying her request to unseal the administrative record. We affirm both decisions.

We glean the following pertinent facts from the record, some of which are not in dispute.[2] On November 24, 2012, appellant applied for an accidental disability retirement effective December 1, 2012. Her last day of work was March 26, 2012. In her application, appellant claimed that on September 8, 2010, as she was looking at books in a crate on the floor in her classroom, a custodian, who was behind her, lifted a bucket causing a metal mop handle to fall out of the bucket and strike the top right side of her head. Appellant claimed she experienced "a host of post-concussive symptoms . . . on a daily basis with

---

[1] As the court affirms the sealing of the administrative record, we use initials for the appellant. We conclude that, under the under the particular set of facts and circumstances in this matter, appellant's privacy constitutes a compelling interest that outweighs the Judiciary's commitment to transparency.

[2] A Joint Stipulation of Facts is not part of the record on appeal.

A-2658-18

enough frequency and intensity" to prevent her from performing her job as a teacher. She alleged that she needed to stay at home to minimize both her suffering and the possibility of being hit again in the head.

On April 4, 2013, the Board denied appellant's application for accidental disability retirement benefits. The Board found that the event that caused appellant's reported disability: (a) was "identifiable as to time and place"; (b) "undesigned and unexpected"; (c) "occurred during and as a result of [appellant's] regular or assigned duties"; and (d) was "not the result of [appellant's] willful negligence." The Board concluded appellant was "not totally and permanently disabled from the performance of [her] regular and assigned job duties" and "not physically or mentally incapacitated from the performance of [her] usual or other duties that [her] employer [was] willing to offer." The Board further determined that "there is no evidence in the record of direct causation of a total and permanent disability." Appellant remained eligible to begin collecting monthly ordinary retirement benefits after she reached normal retirement age as designated in the pension system. Appellant was advised that she could appeal the Board's decision within forty-five days, or the decision would be final.

A-2658-18

By letter dated June 18, 2013, and email dated June 26, 2013, appellant submitted additional medical documentation in support of her application.  On July 12, 2013, the Board directed that its independent medical examiner (IME), neuropsychologist Richard A. Filippone, Ph.D., be provided with the additional documentation and requested that he provide an addendum to his January 30, 2013 report "to determine if the new information alters his opinion."  Appellant was informed that upon receipt of the addendum and the recommendation of the Medical Review Board (MRB), the Board would issue its final determination.

On October 4, 2013, the Board reconsidered appellant's application after considering the new medical documentation she provided, the previous reports, the IME report addendum, and the recommendations of the MRB.  The Board reaffirmed its prior decision denying the application.

On November 13, 2013, appellant appealed the Board's decision, and the matter was transferred to the Office of Administrative Law (OAL) for determination as a contested case and assigned to an Administrative Law Judge (ALJ).  The ALJ conducted hearings on August 8, 2017 and December 22, 2017, and closed the record on March 29, 2018, following the submission of briefs. Appellant was represented by counsel before the ALJ.  Three witnesses testified: appellant, Dr. Hugo M. Morales, and Dr. Filippone.

The ALJ issued a comprehensive twenty-three-page initial decision, which summarized the testimony of each witness, set forth his factual and credibility findings, and applied the applicable law. Because the decision rested on whether appellant met her burden of proof given the conflicting testimony, we recount the pertinent testimony and the ALJ's findings in some detail.

Appellant's Testimony

Appellant began teaching in 2001. On September 8, 2010, while at work, she was struck on the top right side of the head by a mop handle. She did not lose consciousness. About thirty minutes later, appellant started to get a headache. Following a faculty meeting, she went to see the school nurse, who referred her to the workers' compensation clinic. Although appellant wanted to have testing done, the doctor declined and advised her to go the emergency room if the symptoms got worse. The doctor prescribed ibuprofen.

About ten days later, appellant went to Concentra Medical Center complaining her symptoms had worsened. The doctor told her she could not have a headache from a blow to the head that long after the accident and said he would refer her to a neurologist. When the referral did not materialize, appellant saw Dr. Jose Soto Perillo, a psychiatrist, twice in 2011.

A-2658-18

Appellant had pre-existing conditions. Beginning in 2007, appellant began to have problems with allergies that caused sinus headaches, anxiety, and a choking sensation. She also experienced depression and anxiety due to a disagreement with her supervisor.

After the accident, appellant continued to work with difficulty but reacted to noise at school. She stated she knew something was wrong with her brain and that her brain felt "broken." Her own physician sent her for a CT scan and MRI, which were both normal. Appellant stated she had crying spells, difficulty concentrating, and felt pressure on the top right side of her head that was triggered by noise.

While still working, appellant took leaves as long as three months. Appellant frequently experienced nightmares about getting hit in the head after the accident. While she had difficulty sleeping prior to the accident, her insomnia became more severe. Appellant stated she was unable to perform her duties as a teacher or hold any other job. She claimed she felt pressure in her head and that she could not stop crying.

Appellant saw her other psychiatrist, Dr. Morales, and her clinical neuropsychologist, Sandra L. Hunt, Ph.D., once or twice a year, either in person,

A-2658-18

by Skype, or telephone. She stopped taking all medication with the approval of her doctors.

Appellant continued to work for approximately eighteen months after the accident. She claimed she had not driven a car since the accident but is able to run errands, cook, and clean.

Dr. Morales' Testimony

Dr. Morales was accepted as an expert in psychiatry. He began treating appellant in March 2012 and she was still under his care as of 2017. Dr. Morales opined that appellant's complaints indicated she was suffering from post-traumatic stress disorder (PTSD) and mild traumatic brain injury. He reported that Dr. Hunt and Dr. Martinez, a neurologist, agreed with those diagnoses and that appellant was unable to work as a teacher.

Dr. Morales noted that during waking hours, a person with PTSD may be hyper vigilant or be hypersensitive to all noise. They may also experience nightmares and insomnia.

Dr. Morales noted that appellant wore a bicycle helmet to his office to protect her head. She exhibited serious anxiety about walking near tall buildings or through a supermarket with tall shelves. He considered these symptoms to be characteristic of PTSD.

A-2658-18

In November 2012, Dr. Morales diagnosed appellant with PTSD, major depressive disorder, anxiety, and traumatic brain injury and opined these conditions resulted from the accident. Appellant was prescribed Silenor for insomnia, Wellbutrin for anxiety and depression, and Naproxen for headaches.

Dr. Morales further opined that the PTSD led to functional disabilities that limited appellant's daily activities and caused difficulty with social events and gatherings, because she was fearful that any movement would aggravate her physical condition. He described appellant as lacking concentration and focus, unable to finish anything she started, and obsessed with being hit on the head again, rendering her unable to function properly on any level. He stated that appellant needed a quiet, dark place to rest her brain. He described appellant's mental state as being very fragile and dysfunctional, with an inability to control her emotions. She appeared anxious, moody, and depressed.

Appellant was seen by a neuroradiologist, Michael L. Lipton, M.D., who interpreted her MRI films. He found structural damage to her brain's white matter in the area she was struck. Dr. Lipton reported that most patients with mild traumatic brain injury do not experience unconsciousness and recover within months. However, a minority have symptoms and dysfunction that persist indefinitely.

8

Dr. Morales noted that a person can suffer a concussion without developing a brain lesion or experiencing loss of consciousness. He rejected Dr. Filippone's conclusion that appellant had a histrionic personality and could not have PTSD unless she experienced life-threatening trauma. He further opined that appellant did not have agoraphobia.[3]

On cross-examination, Dr. Morales acknowledged that ninety percent of the information is subjective, and appellant's self-reported complaints are all subjective in nature. Appellant was treated for anxiety, panic attacks, and problems sleeping before the accident.

In addition, appellant had two MRIs. The first was normal. The second showed microscopic lesions of the white matter on the right side of the brain. The MRI report describes this as "[w]hite matter abnormalities with sequelae of traumatic brain injury." Dr. Morales acknowledged there were other possible causes of such lesions.

Dr. Morales explained that a concussion can take weeks or months to develop symptomatology, such as soft tissue swelling or tenderness. It can also

---

[3]  Agoraphobia is an anxiety disorder characterized by a marked fear, anxiety, or avoidance of public places, often perceived as being too open, enclosed, crowded, or dangerous. Diagnostic and Statistical Manual of Mental Disorders 217-19 (5th ed. 2013).

take weeks or months for the psychopathology to become clinical. When asked whether he would expect someone with no swelling, no tenderness, no cuts, no scrapes, and no contusions at the time of the accident to have pain in the scalp four years later, Dr. Morales stated that it could happen.

On redirect, Dr. Morales stated the accident was a substantial cause of appellant's disability and that she did not have PTSD before the accident.

Dr. Filippone's Testimony

Dr. Filippone was accepted as an expert in neuropsychology and psychology. He prepared a January 30, 2013 report and three addenda.

As to appellant's credibility, Dr. Filippone found many of her claims related to her cognitive status were untrue. Although she claimed she cannot think, concentrate, or remember, neuropsychological testing performed by Dr. Hunt showed appellant's results were almost entirely in the average to superior range. Although appellant claimed she could not function, do anything, or teach, she continued to work as a teacher for eighteen months after the accident.

Dr. Filippone found appellant had significant anxiety or histrionic behaviors. She came to his office wearing a bicycle helmet, explaining that she did so for safety because people throw things out of windows and she did not

want another severe traumatic brain injury. Appellant made religious references throughout the evaluation.

Dr. Filippone opined that appellant did not even suffer a concussion. He concluded that appellant exaggerated her symptoms. He noted appellant had no bruise, bump, or laceration from the accident. Initially, her only complaints were headaches, which are subjective. He viewed appellant's behavior during Dr. Hunt's evaluation, which included sobbing, as very exaggerated some two years after the accident. He noted that appellant scored in the average to superior range on most aspects of the test and that several low scores did not demonstrate functional behavioral problems. Her full-scale IQ and working memory index were both in the average range. Her processing speed was at the top of the low average range.

Dr. Filippone found appellant had pre-existing conditions including panic disorder with mild agoraphobia, vocationally oriented stress, and chronic sleep disorder. He noted that she may have generalized anxiety disorder, undifferentiated somatoform disorder, and personality disorder with histrionic features. Dr. Filippone opined that none of appellant's symptoms were directly related to the accident. He disputed the diagnosis of post-concussive syndrome

11

because there was no mechanism of injury, and the pattern of symptoms was inconsistent with that diagnosis but consistent with her other diagnoses.

Dr. Filippone also disputed the diagnosis of mild traumatic brain injury, noting that the first MRI showed no evidence of brain injury and the white matter abnormalities disclosed by the second MRI were not in an area that would affect cognition. He concluded that appellant was not permanently and totally disabled from performing the duties of a teacher.

On cross-examination, Dr. Filippone acknowledged that a person could have mild traumatic brain injury without losing consciousness, having bleeding on the brain, abnormal diagnostic tests, or gross signs of physical damage. He further acknowledged that a mild traumatic brain injury can affect a person's cognitive, emotional, behavioral abilities, and personality functioning. In addition, the symptoms of traumatic brain injury are largely subjective; headaches are a symptom of post-concussive syndrome, and dizziness, anxiety, and memory loss can also be symptoms of post-concussive syndrome.

On redirect, Dr. Filippone opined that appellant exhibited the behavior of a person who is exaggerating her symptoms and described appellant's presentation as the most exaggerated, histrionic, and incredible he ever heard.

A-2658-18

The ALJ's Analysis of the Evidence

The ALJ found Dr. Filippone's opinion that appellant did not suffer a mild traumatic brain injury was not persuasive and his conclusion that there was no mechanism of injury was inaccurate. The ALJ noted "Dr. Hunt described the object that struck [appellant] as a heavy mop handle, and [appellant] said that it was solid metal." The ALJ concluded that "[a]n institutional-type mop can have a heavy metal handle that could readily cause an injury[,]" and did not accept "Dr. Filippone's assertion that there was no mechanism of injury . . . ."

The ALJ recounted that Dr. Filippone acknowledged that that a person suffering a mild traumatic brain injury does not necessarily lose consciousness or have external injuries. In addition, the second MRI was more detailed. The fact that appellant's psychological testing showed that her cognitive functioning was intact did not mean she did not sustain a mild brain injury. The ALJ further noted that Dr. Morales' opinion was supported by the reports of Dr. Hunt and Dr. Lipton. The ALJ found that appellant suffered a mild traumatic brain injury from the September 8, 2010 accident.

The ALJ next considered whether appellant exaggerated her symptoms. He concluded that "[a]ll of [appellant's] complaints related to her physical, cognitive, and emotional condition [were] subjective in nature . . . and not

13

subject to verification by objective means. Nonetheless, [appellant's] complaints of cognitive impairment . . . can be compared to the results of the psychological testing." The test results showed appellant's cognitive functioning was "in the average to superior range in most areas." The ALJ concluded that appellant "exaggerated her symptoms in regard to cognitive functioning." He found appellant's complaints regarding physical and emotional functioning were not credible.

The ALJ found appellant did not satisfy the requirements for accidental disability retirement benefits. He explained that while appellant had suffered a mild traumatic brain injury,

> Dr. Lipton noted in his report, most patients who suffer a mild traumatic brain injury recover over a period of time. While some patients with mild traumatic brain injury have symptoms that persist indefinitely, [appellant] has not presented credible evidence that she falls into this category. It follows that [appellant] has not established that she is permanently and totally disabled as a result of mild traumatic brain injury. Under the circumstances, I [conclude] that [appellant] has failed to prove by a preponderance of the believable evidence that she is permanently, and totally disabled. In view of this conclusion, it is unnecessary to reach the issue of direct result.

Despite being granted an extension to do so, appellant did not file any exceptions to the ALJ's initial decision. On October 17, 2018, the Board issued

14

a revised final administrative decision adopting the ALJ's initial decision which affirmed the Board's determination denying appellant's application for accidental disability retirement benefits. Appellant was advised that she had forty-five days to appeal the decision.

Thereafter, appellant's unopposed request to seal the record was granted by the Board. Appellant subsequently requested that the record be unsealed. The Board declined to do so.

This appeal followed. Appellant filed her initial notice of appeal on February 25, 2019, some 131 days after the Board rendered its final decision. Appellant raises the following points for our consideration:

> POINT I
>
> THE BOARD'S DECISION TO DENY [APPELLANT ACCIDENTAL DISABILITY RETIREMENT BENEFITS] WAS ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE.
>
> POINT II
>
> [THE] ALJ . . . MADE AN ERROR THAT LED HIM TO DENY [APPELLANT'S ACCIDENTAL] DISABILITY [RETIREMENT BENEFITS].
>
> POINT III
>
> THE SEALING OF [THE] RECORD ROBBED [APPELLANT] OF [HER] RIGHT TO DISCUSS [HER] PENSION CASE.

We are guided by the following well-established principles. "Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Fireman's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). The agency's decision should be upheld "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Herrmann, 192 N.J. at 27-28). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006) (citations omitted).

"[A]gencies have 'expertise and superior knowledge . . . in their specialized fields.'" Hemsey v. Bd. of Trs., Police & Fireman's Ret. Sys., 198 N.J. 215, 223 (2009) (alteration in original) (quoting In re License Issued to Zahl, 186 N.J. 341, 353 (2006)). We therefore accord deference to the "agency's interpretation of a statute" it is charged with enforcing. Thompson v. Bd. of Trs., Teachers' Pension & Annuity Fund, 449 N.J. Super. 478, 483 (App. Div. 2017) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007)), aff'd o.b., 233 N.J. 232 (2018). "'Such deference has been specifically extended to state agencies that administer pension statutes,' because 'a state agency brings experience and specialized knowledge to its task of

16

administering and regulating a legislative enactment within its field of expertise.'" Id. at 483 (quoting Piatt v. Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015)).

The factual "findings of an ALJ 'are considered binding on appeal, when supported by adequate, substantial and credible evidence.'" Oceanside Charter Sch. v. Dep't of Educ., 418 N.J. Super. 1, 9 (App. Div. 2011) (quoting In re Taylor, 158 N.J. 644, 656 (1999)). "The choice of accepting or rejecting testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Ibid. (quoting In re Howard Sav. Bank, 143 N.J. Super. 1, 9 (App. Div. 1976)). Deference is "especially appropriate when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)).

"A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting Herrmann, 192 N.J. at 28).

That said, when the facts are undisputed, whether an injury occurred "'during and as a result of the performance of regular or assigned duties' is a legal question of statutory interpretation, which we review de novo." Bowser v. Bd. of Trs., Police & Firemen's Ret. Sys., 455 N.J. Super. 165, 170-71 (App. Div. 2018). Conversely, when controlling facts are disputed, we afford deference to the Board's factual findings. Oceanside Charter Sch., 418 N.J. Super. at 9.

Like all public retirement systems, the TPAF provides for both ordinary and accidental retirement benefits. N.J.S.A. 18A:66-39. The principal difference between ordinary and accidental disability retirement "is that ordinary disability retirement need not have a work connection." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 42 (2008). A TPAF member may be retired on an accidental disability pension if the employee is "permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties . . . ." N.J.S.A. 18A:66-39(c); accord Kasper v. Bd. of Trs., Teachers' Pension & Annuity Fund, 164 N.J. 564, 573 (2000). Appellant must demonstrate the accident "constitutes the essential significant or the substantial contributing

cause of the resultant disability." Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J.174, 188 (1980).

With these principles in mind, we consider whether the Board's decision was arbitrary, capricious, unreasonable, or unsupported by substantial credible evidence in the record.

We first note that an ALJ's factual findings of lay-witness credibility generally receive deference. See N.J.S.A. 52:14B-10(c) ("The [Board] may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless . . . the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record."). In considering that evidence, we "give 'due regard to the opportunity of the one who heard the witnesses to judge of their credibility . . . .'" Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). "[I]t is not for us or the agency head to disturb that credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. State, Dep't Hum. Servs., 184 N.J. 367, 384 (2005). Our deference to an ALJ's findings "extends to credibility determinations that are not explicitly enunciated if the record as a whole makes

these findings clear." In re Snellbaker, 414 N.J. Super. 26, 36 (App. Div. 2010) (citations omitted).

Generally, "where the medical testimony is in conflict, greater weight should be accorded to the testimony of the treating physician" as opposed to an evaluating physician who has examined the employee on only one occasion. Bialko v. H. Baker Milk Co., 38 N.J. Super. 169, 171-72 (App. Div. 1955); accord Mernick v. Div. of Motor Vehicles, 328 N.J. Super. 512, 522 (App. Div. 2000). "Nevertheless, expert testimony need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing In re Yaccarino, 117 N.J. 175, 196 (1989)). Accordingly, "[t]he factfinder may accept some of the expert's testimony and reject the rest." Id. at 430 (citing Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993)). Moreover, "a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431 (citing Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)). "Indeed, a judge is not obligated to accept an expert's opinion, even if the expert was 'impressive.'" State v. M.J.K., 369 N.J. Super. 532, 549 (App.

Div. 2004) (quoting State v. Carpenter, 268 N.J. Super. 378, 383 (App. Div. 1993)).

The factfinder determines the weight accorded to expert testimony. LaBracio Family P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). The factfinder is free "accept some of the expert's testimony and reject the rest." M.J.K., 369 N.J. Super. at 549; see also In re Civ. Commitment of R.F., 217 N.J. 152, 174-77 (2014).

"[T]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." State v. Jenewicz, 193 N.J. 440, 466 (2008) (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)). "This is particularly true when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts." M.J.K., 369 N.J. Super. at 549. The weight given to expert testimony also depends on whether the expert's "conclusions are based largely on the subjective complaints of the patient . . . ." Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 86 (App. Div. 1961).

The factfinder, rather than a reviewing court, "is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing

Bonnco, 115 N.J. at 607). Ultimately, "[t]he choice of accepting or rejecting testimony of witnesses rests with the administrative agency, and where such choice is reasonably made, it is conclusive on appeal." Oceanside Charter Sch., 418 N.J. Super. at 9 (quoting Howard Sav. Bank, 143 N.J. Super. at 9). Deference is "especially appropriate when the evidence is largely testimonial and involves questions of credibility." J.W.D., 149 N.J. at 117. Here, the evidence largely consisted of conflicting expert testimony and appellant's subjective symptoms, which required the factfinder to determine the credibility of the witnesses and the weight to accord to their testimony.

Our careful review of the record reveals that the ALJ's findings and conclusions, which the Board adopted, are supported by substantial credible evidence in the record and that the Board's decision was not arbitrary, capricious, or unreasonable. Accordingly, we discern no basis to overturn the Board's determination that appellant was ineligible for accidental disability retirement benefits. See In re Young, 202 N.J. 50, 71 (2010) (upholding an agency decision where substantial credible evidence in the record supported the agency's findings.).

Appellant's remaining arguments lack sufficient merit to warrant extended discussion in this opinion. R. 2:11-3(e)(1)(E). Appeals from final decisions of

22

state administrative agencies must be filed "within [forty-five] days from the date of service of the decision or notice of the action taken."  R. 2:4-1(b).  The request to seal the record and order granting same did not extend the forty-five-day period to file this appeal from the Board's final decision denying her application for accidental disability retirement benefits.  Appellant did not move to file the appeal as within time.  Thus, her appeal was untimely and was vulnerable to dismissal on that basis.  We have nevertheless addressed the merits of her appeal as the Board did not move to dismiss the appeal as untimely.

Appellant argues that sealing the administrative record deprives her of her First Amendment right to discuss her pension case.  We reiterate that appellant initially requested that the administrative record be sealed.  The sealing order, it bears noting, prevents public disclosure of the evidence in the record to protect appellant's privacy interests.  It does not preclude her from discussing the case.

The administrative record is replete with testimony and reports discussing appellant's psychiatric symptoms and diagnoses, neuropsychological test results, and related facts.  N.J.A.C. 1:1-14.1(b) recognizes "the need to . . . protect parties and witnesses from undue embarrassment or deprivation of privacy . . . ."  We discern no abuse of discretion by the ALJ or the Board.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

24